**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **HOWARD ADAMS,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:  2:18-CV-00319-RDP** |
| } | |
| **CSX TRANSPORTATION, INC.,** } | |
| } | |
| **Defendant.** } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendant CSX Transportation Inc.'s Motion for Summary Judgment.  (Doc. # 36). The Motion is fully briefed (Docs. # 36, 38, 43, 44, 45, 50) and ripe for review. After careful consideration, and for the reasons discussed below, Defendant's Motion (Doc. # 36) is due to be granted.

## I.    Background[1]

This case stems from Defendant CSX Transportation Inc.'s ("CSX" or "Defendant") suspension of Plaintiff Howard Adams ("Plaintiff" or "Adams") due to its finding that he dishonestly used FMLA leave on December 25, 2017. CSX is a freight railroad that maintains an operations hub in Birmingham, Alabama (Doc. # 38-1 at ¶ 2). Adams was hired by CSX in 2006 as a locomotive conductor in the CSX's Southwest region (specifically, the Birmingham terminal). (*Id.*; Doc. # 1 at ¶¶ 5-6). Locomotive conductors operate trains.  (Doc. # 38-1 at ¶ 2). Most locomotive conductors are part of the Defendant's "Train and Engine Workforce" ("T&E"). (*Id.*).

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Throughout 2016-2017, Adams was a T&E employee responsible for operating trains between Birmingham and Nashville. (Doc. # 38-3 at 13-14).

### A. CSX Staffing Procedures

To meet customer demands, CSX runs trains twenty-four hours a day, seven days a week, 365 days a year. (Doc. # 38-2 at ¶ 4). Generally, T&E employees do not work a set schedule. (*Id.*). Rather, T&E employees are assigned to a pool and placed on a rotating list. (*Id.*). Employees are then called into work on an as needed basis, meaning that they can be called in at any time.[2] (*Id.*). T&E employees indicate that they are available to work by "marking up" for it. (*Id.*). Similarly, T&E Employees indicate they are unavailable to work by "marking off" for an approved reason. (*Id.*). If an employee is marked off, he cannot be called into work. (*Id.*).

### B. CSX Attendance Policy

T&E Employees are subject to the "CSX Transportation Attendance Point System" ("CAPS"). (Doc. # 30-10 at 1). Generally, that policy assesses points to employees for certain absences, and employees are progressively disciplined each time they reach a 20-point threshold.[3] (*Id.* at 1, 4-6). Employees are not assigned points for taking FMLA leave. (*Id.*). CAPS also provides a Good Attendance Credit:

> Three points will be deducted from an employee's accumulated point total for every calendar month in which the employee has no attendance incidents covered under the [a]ttendance [p]oint [s]chedule [] and has not otherwise been absent during the calendar month for any reason, with the exception of approved vacation, demand day off (DDO), personal leave, jury duty, work-related illness or injury with valid doctor's note and bereavement leave days.

---

[2] Unless, of course, the employee had "marked off" for an approved reason. (Doc. # 38-2 at ¶ 4).

[3] For example, if a T&E employee is sick and does not provide valid medical documentation he accrues four points per day Monday-Thursday, and six points per day Friday-Sunday. (Doc. # 38-10 at 5).

(*Id.* at 5). So, while T&E employees are not assessed points for their FMLA absences, they are not eligible for the good attendance credit when they take FMLA leave. (*Id.* at 7).

### C. Adams's FMLA Leave

Adams suffers from "lumbar radiculopathy and cervical radiculopathy," which causes him to experience reoccurring symptoms of severe back pain, back spasms, and sharp radiating pain in his right leg. (Doc. # 38-3 at 58-65; Doc. # 1 at ¶ 59). Due to these conditions, Adams applied for intermittent Family and Medical Leave Act ("FMLA") leave in June 2015. (Doc. # 38-3 at 49). Adams's initial request for FMLA leave was approved by CSX, and so were his subsequent applications in 2015 and 2016. (*Id.*). Adams's most recent approval occurred on June 7, 2017. (Doc. # 1 at ¶ 14). CSX approved Adams for FMLA leave for the certified leave period of June 6, 2017 through December 30, 2017. (*Id.*). Adams was approved for FMLA leave based on an estimated frequency of two episodes per month at three days per episode, and two office visits per month. Adams began using his FMLA leave in 2015, and continued to use it through December 2017. (Doc. # 38-3 at 58-65).

Prior to the events that gave rise to his claims in this case, CSX warned Adams twice for misusing his FMLA benefits. (Doc. # 38-2 at 2, 4, 17, 20). First, in August 2016, Adams received a warning letter from CSX after he used his FMLA benefits on fourteen weekends in a twenty-eight-week span. (*Id.*). Second, in May 2017, CSX sent Adams a final warning letter after he used his FMLA benefits on four weekends in a seven-week span. (*Id.*).

### D. CSX Disciplinary Process

CSX prohibits employee dishonesty and classifies it as a fireable offense. (Doc. # 38-1 at 19-20). The company maintains a disciplinary process. (*Id.* at 2, 7-14). Employees who are believed to have engaged in misconduct are charged with an offense, and then are required to

attend a disciplinary hearing on the charges.[4] (*Id.*). Hearings are conducted by a CSX manager. (*Id.* at 2, 10). At the hearing the CSX manager testifies about the basis for the charges, questions witnesses, and rules on evidentiary objections. (*Id.*). In most cases, the CSX manager who testifies as the charging officer is the same manager who decided to bring the charges. (*Id.*).

The CSX managers who serve as hearing officers are neither lawyers nor labor relations specialists. (Doc. # 38-1 at 2-3). To aid the charging officer, CSX's labor relations department or other company officials will sometimes prepare a script or a list of questions to be asked. (*Id.*). According to CSX, this practice is designed to provide continuity in disciplinary proceedings. (*Id.*). Additionally, the "script" ensures that that the facts relevant to the charges become part of the disciplinary record. (*Id.*).

The charged employee is represented by a union official and may present evidence in his own defense. (Doc. # 38-1 at 2, 7-14). The union official who represents the employee is also allowed to prepare questions for witnesses prior to the hearing. (*Id.* at 2-3). Discipline is not decided upon or assessed at the hearing. (Doc. # 38-1 at 2, 7-14). However, after the hearing concludes, the hearing officer may issue recommendations or findings. (*Id.* at 19-20). Disciplinary decisions are made by the General Superintendent for the Region (or his designee) after receiving a recommendation from the Labor Relations Department. Generally, discipline must be assessed within 30 days of the hearing. (*Id.* at 8). An employee who is disciplined can "grieve" it and have his claim heard by a neutral arbitrator. (*Id.* at 12-13).

### E.  CSX Employees' Suspect FMLA Usage in December 2017

Over Christmas 2017, over 750 CSX employees used their FMLA benefits and marked off from work. (Doc. # 38-2 at 2). Based on the unusual number of employees who marked off from

---

[4] When charged with certain major offenses, employees may be suspended from service without pay, pending a hearing. (Doc. # 38-1 at 2, 7-14

work over the Christmas 2017 holiday, CSX believed that some employees had used their leave dishonestly and began investigating the mark-offs. (*Id.* at 2-3). To determine whether T&E employees with FMLA benefits had a pattern of marking off over other holidays or special events, CSX reviewed the attendance records of those employees who used FMLA benefits over the Christmas 2017 holiday. (*Id.*). Generally, if an employee had marked off at least four out of the past ten holidays, he was charged with dishonesty. (*Id.*). The employee was subsequently removed from service pending a disciplinary hearing.[5] (*Id.*).

### F. Adams's FMLA Leave on December 25, 2017

On December 25, 2017, Adams worked as a conductor on a train from Nashville to Birmingham. (Doc. # 38-3 at 74). Adams testified that a "rough riding locomotive" made for a "bumpy, bumpy ride." (*Id.* at 75, 77, 79). Adams testified that the jarring of the ride irritated his back and triggered an episode. (*Id.*). According to Adams, the pain increased throughout the trip, and by the time he reached home, due to the severe pain, he marked off using his FMLA leave.[6] (*Id.* at 82-83). After returning home, Adams testified that he managed a few hours of sleep, and, consistent with his chiropractor's instructions for managing the pain, spent the majority of Christmas day laying down. (*Id.* at 84-85).

Previously in 2017, Adams also marked off for Father's Day, the fourth of July,[7] and the day after Thanksgiving (Black Friday) until the following Monday. (Doc. # 38-2 at 5; Doc. # 38-

---

[5] CSX excluded employees who used their FMLA benefits for medical conditions that, in the eyes of CSX, obviously explained their mark off. (Doc. # 38-2 at 2-3; Doc. # 38-5 at 84, 92, 98). For example, CSX did not charge employees who used the FMLA benefits for pregnancy or maternity leave. (Doc. # 38-5 at 141-43).

[6] Specifically, Adams marked off using his FMLA benefits from 2:38 a.m. on Christmas day until 5:30 a.m. on the day after Christmas. (Doc. # 38-2 at 5; Doc. # 38-3 at 68).

[7] On the fourth of July, Adams only marked off for part of the day. (Doc. # 38-2 at 5; Doc. # 38-3 at 88; Doc. # 38-4 at 105-06).

3 at 88; Doc. # 38-4 at 105-06). According to CSX, this pattern combined with the timing of the December 25, 2017, mark-off suggested that Adams may have been using his FMLA benefits improperly (*i.e.*, in a dishonest way). (Doc. # 38-2 at 5). CSX charged Adams with misusing his FMLA leave and suspended him from service, pending a disciplinary hearing. (Doc. # 38-3 at 90-91).

Adams was not the only CSX employee removed from service. (Doc. # 38-2 at 3). CSX also charged 123 other employees with dishonesty. (*Id.*). Similar to Adams, these employees used FMLA benefits over the Christmas 2017 holiday, and also marked off on at least 3 previous holidays or special events.[8] (*Id.*).

### G. Adams's Disciplinary Hearing

At Adams's hearing, the manager who testified as the hearing officer was not the manager who had brought the charges. (Doc. # 38-1 at 2). CSX manager Jolanda investigated Adams's suspected FMLA misuse in December 2017. (Doc. # 38-5 at 107). But, because 123 employees were charged, Johnson could not testify at all of the hearings. (Doc. # 38-2 at 3-4). As a result, other managers assisted Johnson and filled in for her at various hearings. (*Id.*). The managers were given "talking points" to use when answering questions at the hearing. (*Id.*; Doc. # 38-5 at 76-80). According to CSX, the "talking points" included answers to questions commonly asked at hearings. (*Id.*). CSX contends that the purpose of the "talking points" was so that the managers could adequately explain the basis for the charges. (*Id.*).

At Adams's hearing, Anita Tingley, the CSX Manager of Field Administration, testified in place of Johnson. (Doc. # 38-2 at 5). Tingley stated that it was possible that Adams's back condition prevented him from working over the Christmas 2017 holiday. (Doc. # 38-4 at 132-33).

---

[8] Of the 123 CST employees charged with dishonesty, 81 were disciplined. (Doc. # 38-2 at 3).

But, she also testified that the circumstantial evidence—including the time Adams marked off on Christmas day, his pattern of FMLA usage over holidays and weekends, and his previous FMLA warnings in 2016 and early 2017—indicated that Adams had improperly used his FMLA benefits to avoid working on Christmas. (*Id.*).

At the hearing, Adams did not dispute that he marked off on Christmas day. (*Id.* at 146-47). Rather, he maintained that he marked off on Christmas day because his "back was bothering him." (*Id.*). Adams submitted two notes from his chiropractor. (Doc. # 38-2 at 110-112). The first note, dated December 26, 2017, asked that Adams be excused from work from December 25-27 because of "ongoing treatment for [] disc herniation as seen on MRI." (*Id.*). The second note, dated January 18, 2018, asked that Adams be excused from work on the other holidays Adams marked off for in 2017.[9] (*Id.*). The Rule 56 evidence record shows that Adams did not see his chiropractor on any of the aforementioned dates, but simply "was under [the chiropractors] care[.]" (*Id.* at 111).

After the hearing, the CSX Manager of Labor Relations, Macon Jones, reviewed the hearing record and recommended that Adams receive a time-served suspension.[10] (Doc. # 38-6 at 112-13). Jones sent his recommendation to CSX Southwest General Superintendent, John Layne. (*Id.* at 123-24). Upon review, Layne believed that a time-served suspension was not enough, given Adams's two previous FMLA warning letters. (*Id.*). Six minutes after receiving the disciplinary recommendation from Jones, Layne replied "Dismissed." (Doc. # 38-6, Exh. E, at 85). Layne followed up with an e-mail encouraging Jones to "[w]in the arbitration!!!" (*Id.*). Jones replied "[c]onsider it done." (*Id.*).

---

[9] Again, these holidays included Father's Day, part of the day on July fourth, and the day following Thanksgiving (Black Friday).

[10] Jones's transcript indicates that he recommended a time-served suspension, as opposed to dismissal, because he was concerned that an arbitrator might view the chiropractor's note differently than he did and overturn the discipline on that basis. Doc. # 38-6 at 123-24).

The morning after the e-mail exchange between Layne and Jones was the day Adams's discipline decision was due. (Doc. # 38-6 at 198). Erica McNair, a member of CSX's Field Administration group, was responsible for sending out Adams's disciplinary letter. (*Id.*). McNair e-mailed Layne asking him to inform her of the final disciplinary decision.[11] (Doc. # 38-7 at 117). There is no evidence in the Rule 56 record that Layne ever responded to McNair. (*Id.*). Jones's boss, Melissa Wheaton, mistakenly believed that Layne had not responded to the disciplinary recommendation. (Doc. # 38-9 at 80-82). Wheaton asked Field Administration to re-send the disciplinary recommendation to Layne. (*Id.*). Again, there is no Rule 56 record evidence that Layne responded to this e-mail. (Doc. # 38-7 at 117). Due to the confusion, Adams was issued a time-served suspension letter, consistent with Jones's initial recommendation. (Doc. # 38-6, Exh. E, at 93).

CSX later realized Adams received a time-served suspension, instead of the dismissal recommended by Layne. Doc. # 38-6 at 23-24). But, CSX left Adams's time-served suspension in place and did not convert it to a dismissal. (*Id.* at 39; Doc. # 38-3 at 109). ). Adams subsequently filed a claim with CSX challenging his suspension. (Doc. # 38-1 at 4). CSX denied the claim.[12] (Doc. # 40-1 at ¶ 4). Plaintiff filed his complaint on February 19, 2018. (Doc. # 1).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking

---

[11] McNair was not copied on Layne's "[d]ismissed" e-mail to Jones.

[12] Adams was given until July 31, 2019 to institute arbitration proceedings. (Doc. # 40-1 at ¶ 4).

for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1381 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III. Analysis

The court has carefully reviewed the Rule 56 record and analyzed Plaintiff's claims under the appropriate legal frameworks. For the reasons stated below, the court concludes that Defendant's Motion for Summary Judgment is due to be granted. [13]

---

[13] In its Motion for Summary Judgment, CSX argues that it is entitled to summary judgment on Adams's claim that it engaged in disability discrimination and violated the ADA. (Doc. # 43 at 29). However, Adams's Complaint does not contain allegations that CSX violated the ADA (Doc. # 1), and Adams's responsive briefing does not address disability discrimination under the ADA. (*See* Doc. # 45). Thus, to the extent Plaintiff alleged disability discrimination claims under the ADA, the court considers any such claim abandoned. *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.") (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

### A. FMLA Claims

"The FMLA grants eligible employees a series of entitlements, among them the right to 'a total of 12 workweeks of leave during any 12–month period' for a number of reasons, including 'a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1267 (11th Cir. 2017) (citing 29 U.S.C. § 2612(a)(1)(D)). "To preserve and enforce these rights, 'the FMLA creates two types of claims: [1] interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act . . . and [2] retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act.'" *Jones,* 854 F.3d at 1267 (quoting *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001)) (internal citations omitted)

Adams brings claims against CSX for both interference with and retaliation for his exercise of FMLA rights on December 25, 2017. The court first addresses Adams's FMLA retaliation claim. It will then turn to his interference claim.

### i. FMLA Retaliation

Adams asserts that he was "denied full benefits and rights under the FMLA, in that he was retaliated against based on his exercise of right to which he was entitled under the FMLA[.]" (Doc. # 1 at ¶ 38). Specifically, Adams claims that, as a result of taking FMLA leave on December 25, 2017, "he was pulled out of service on January 2, 2018 through February 16, 2018, and was assessed a time-served suspension without pay." (*Id.*).

To succeed on this claim, Adams must demonstrate that CSX intentionally discriminated against him for exercising his FMLA rights. *Jones,* 854 F.3d at 1270; *see Strickland*, 239 F.3d at

1207. Stated differently, Adams must show "that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Jones,* 854 F.3d at 1270 (internal quotations and citations omitted). Adams argues that the Rule 56 evidence provides circumstantial evidence of CSX's retaliatory intent.[14] (Doc. # 45 at 32-40); *Shannon v. Nat'l R.R. Passenger Corp.,* 774 F. App'x 529, 544 (11th Cir. 2019) ("Absent direct evidence of a defendant's retaliatory intent, a plaintiff's FMLA retaliation claim is evaluated under the *McDonnell Douglas* framework.").

A plaintiff may establish a prima facia case of FMLA retaliation by using a modified version of the *McDonnell Douglas* standard that applies to Title VII retaliation cases. Under this model, a FMLA plaintiff must show that: "(1) [he] engaged in statutorily protected activity, (2) [he] suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." *Jones*, 854 F.3d at 1271 (internal quotation marks and citations omitted); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If the plaintiff successfully establishes his prima facia case, the burden shifts to the defendant to articulate "a legitimate, nondiscriminatory reason" for the adverse employment action, "which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citations and quotation marks omitted) (emphasis in original). If the defendant satisfies that burden, then once again, the burden shifts back to the plaintiff to prove that defendant's stated reason is merely a pretext for the retaliatory conduct. (*Id.*).

Despite this shifting of the burden of production between the plaintiff and the defendant under the *McDonnell Douglas* framework, "[t]he ultimate burden of persuading the trier of fact

---

[14] To be clear, Adams does not argue, and the court does not find, that there is any direct evidence in the Rule 56 record of FMLA retaliation. (*See* Doc. # 45 at 32-40). Nor has Adams analogized to the Eleventh Circuit's "mosaic" framework in presenting his FMLA retaliation arguments. (Docs. # 1, 45).

that the defendant intentionally [retaliated] against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Here, CSX has not argued that Adams failed to establish a prima facia case of retaliation. (Doc. # 43 at 19; Doc. # 45 at 33). Thus, Adams's FMLA retaliation claim hinges on whether CSX has articulated a legitimate, non-retaliation basis for discipline, and, if so, whether Adams has shown that the reason given for his suspension is actually pretext for retaliation.

### 1. Has CSX Articulated a Good Faith Belief That Adams Dishonestly Used His FMLA benefits?

"Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of [retaliation], the burden of production shifts to the employer to articulate a legitimate, non[retaliatory] reason for its actions." *Gilbert v. Wal-Mart Stores, Inc.,* No. 2:08-CV-2405-RDP, 2010 WL 11565278, at *5 (N.D. Ala. July 30, 2010) (citing *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir. 1997)).

CSX argues that it did not discipline Adams because he used FMLA leave. (Doc. # 43 at 20). Rather, CSX argues it had a good faith belief, based on Adams's prior suspected FMLA misuse, that Adams dishonestly used his FMLA on December 25, 2017. (*Id.*). CSX maintains that disciplining an employee for suspected dishonesty, even if that belief turns out to be mistaken, is a legitimate, non-retaliatory basis for discipline. (*Id.*). CSX is correct. *E.E.O.C. v. Total Sys. Servs., Inc.,* 221 F.3d 1171, 1176 (11th Cir. 2000) (holding that an employer is entitled to rely on its good faith belief about falsity of employee's statements in issuing discipline); s*ee Damon v. Fleming Supermarkets of Florida, Inc*., 196 F.3d 1354, 1360 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.").

Courts have consistently held that an employee violation of a work rule (or policy) is a legitimate, non-retaliatory reason for adverse actions. *See Burdine*, 450 U.S. at 256; *see also Douglas v. DeKalb County, GA*, 308 F. App'x. 396, 400 (11th Cir. 2009); *Brillinger v. City of Lake Worth*, 317 F. App'x. 871, 877 (11th Cir. 2008). Thus, the burden shifts back to Adams to show that this reason was pretext for retaliation.

### 2. Has Adams Pointed to Substantial Evidence Suggesting That Defendant's Reason for His Suspension is a Pretext for Retaliation?

A "[p]laintiff may demonstrate that [a defendant's] reasons were pretextual by revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'" *Springer v. Convergys Customer Mgmt. Grp. Inc*., 509 F.3d 1344, 1348-49 (11th Cir. 2007), quoting *Cooper v. Southern Co.,* 390 F.3d 695, 725 (11th Cir. 2004), *cert. denied,* 546 U.S. 960 (2005). However, a reason is not a pretext for retaliation "unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason." *Springer*, 509 F.3d at 1348 (quoting *Brooks v. County Comm'n of Jefferson County,* 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis in original)); *see St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, (1993).

The Eleventh Circuit has found in cases similar to this one that an honest, but mistaken, belief that an employee engaged in misconduct is enough to defeat a retaliation claim. *Total Sys.*, 221 F.3d at 1176-77 (holding that a plaintiff cannot show pretext merely by showing that an employer's good faith belief that she engaged in misconduct is mistaken.); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("[Courts] are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.").

Adams argues that a reasonable jury could find for him on a "cat's paw" theory of liability. The "[c]at's paw theory of liability, also referred to as 'subordinate bias theory,' [seeks] to hold an employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision."[15] *Sims v. MVM, Inc.,* 704 F.3d 1327, 1335 (11th Cir. 2013) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 414 (2011). Cat's paw liability requires proof that: (1) a supervisor performed an act motivated by discriminatory (or, in this case, retaliatory) animus which was intended to cause an adverse employment action; and (2) the supervisor's act proximately caused the ultimate employment action. *Staub*, 562 U.S. at 414.

Adams maintains that where, as here, "a disciplinary recommendation by a party with no power to actually discipline the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's [discipline']." (Doc. # 45 at 34 ) (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999)); *see Jones v. City of Heflin*, 207 F. Supp. 3d 1255 1272-73 ("In such a case, the recommender is using the decision maker as the mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory [or retaliatory] animus."). Adams argues that Jolanda Johnson was the "de facto" decisionmaker, and "that [fact that] Johnson and her team prejudged Adams and the other charged employees is undeniable in view of the scripts and instructions to the hearing officers on handling the union's objections." (Doc. # 45 at 33-34).

---

[15] "The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Judge Posner in 1990. In the fable, a monkey [uses flattery to] induce[] a cat [] [] to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward." *Staub v. Proctor Hosp.,* 562 U.S. 411, 416 n.1 (2011).

Even viewing the facts in the light most favorable to Adams, the Rule 56 evidence falls far short of establishing that Johnson's decision to charge him with dishonesty was motivated by a "retaliatory animus." Adams does not dispute any of the facts on which Johnson based her recommendation. In fact, Adams admits that he used FMLA leave on four of the past ten holidays, and that he received two warnings regarding suspected improper FMLA prior to his suspension. Adams admits that that his condition is *not* more likely to flare up over holidays or weekend.

It is also undisputed that over 750 CSX employees used FMLA leave to mark off over the Christmas 2017 holiday break. Of those 750 employees, Johnson investigated and charged 123 employees with dishonesty. Only 81 employees were formally disciplined. Johnson reviewed Adams's file, along with hundreds of others, in determining whether he used his FMLA dishonestly. Adams was treated in the same way as every other  CSX employee who marked off FMLA for Christmas day. He was not singled out by Johnson, or otherwise targeted by CSX. Thus, the evidence in the Rule 56 record does not give any indication that Johnson was motivated by a "discriminatory animus."

Further, even if the Rule 56 evidence suggested some motive on the part of Johnson (and, to be clear, it does not), Adams has failed to show that she was the "proximate cause" of his suspension. Adams does not dispute that he was given the opportunity to appear at a disciplinary hearing and to present evidence. It is also undisputed that Jones made the initial decision in this matter, after thoroughly reviewing the hearing evidence, and then submitted a disciplinary recommendation to Layne. Further, there is no nothing in the Rule 56 file that indicates Jones (or Layne) consulted with Johnson in deciding whether and how to discipline Adams.

Adams also argues that Jones's review was not truly independent because his boss (Melissa Wheaton) gave him criteria to use when reviewing the record. But, the Rule 56 record suggest in

any way that Johnson worked with Wheaton to develop the criteria. Again, this evidence fails to show that Johnson was the "de facto" decisionmaker. Because Adams has failed to show that Johnson was motivated by a "retaliatory animus" and, in any event, also failed to show that she was the "proximate cause" of his suspension, his cat's paw theory necessarily fails.

Alternatively, Adams argues the following evidence is sufficient to show that his suspension was pretext for retaliation:  (1) Johnson failed to perform a sufficient individualized review of his December 25, 2017 FMLA usage; (2) CSX was "willfully ignorant" because it failed to fully investigate Adams's FMLA usage ; (3) CSX departed from its normal policies and procedures in disciplining Adams; (4) Jones's mistake as to Adams's FMLA authorization; and (5) Johnson's testimony that the only employees exonerated for dishonest FMLA usage over the Christmas 2017 holiday were those who presented medical documentation at their disciplinary hearing.

But, Adams cannot get to a jury by merely criticizing CSX's investigation. A reason articulated by an employer is not a pretext for retaliation "unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason." *Springer*, 509 F.3d at 1348 (quoting *Brooks*, 446 F.3d at 1163 (emphasis in original)). Adams has pointed to what he contends were flaws in the CSX disciplinary process.[16] However, he has failed to make the necessary showing that CSX did not have a good-faith belief that he dishonestly used his FMLA leave, *and* that the underlying reason for his suspension was actually retaliation. In other words, even if it could be said that CSX was mistaken in its view that Adams misused his FMLA leave, and even if Adams actually used his FMLA leave honestly, that would still be insufficient to create an issue of fact for a jury to

---

[16] Of course, one of those flaws was that Erica McNair and Melissa Wheaton never got a response from Layne about the final disciplinary decision for Adams. (Docs. # 38-7 at 117; 38-9 at 80-82). Therefore, Adams received a time-served suspension rather than being fired. (Doc. # 38-6, Exh. E at 93).

decide here. This is because Adams has not pointed to any Rule 56 evidence that suggests that CSX's belief that he misused FMLA leave, even if in error, was not in good faith. *Total Sys.,* 221 F.3d at, 1176-77 (11th Cir. 2000).

Adams has failed to submit evidence sufficient to show that his suspension is a pretext for retaliation; therefore, his FMLA retaliation claim is due to be dismissed.

### B. FMLA Interference

To establish an FMLA interference claim, "'a[] [plaintiff] need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied.'" *Krutzig v. Pulte Home Corp.,* 602 F.3d 1231, 1235 (11th Cir. 2010) (quoting *Strickland v. Water Works and Sewer Bd. of Birmingham,* 239 F.3d 1199, 1206-07 (11th Cir. 2001)). The employee need not allege that his employer intended to deny the benefit, because "the employer's motives are irrelevant." *Strickland*, 293 F.3d at 1208.

"Courts faced with similar facts have repeatedly held that a termination based on such 'an honest suspicion' cannot support an [FLSA] interference claim[.]"[17] *Robinson v. Sailormen, Inc.*, No. 1:14CV44-MW/GRJ, 2017 WL 10635662, at *4 (N.D. Fla. Sept. 22, 2017) (holding that "the undisputed evidence establishes that an employer terminated Plaintiff because he honestly (though, perhaps, mistakenly) believed that Plaintiff was not using leave time for its intended purpose and that she had not been candid with him about her leave."); *Moughari v. Publix Super Markets, Inc.,*

---

[17] Plaintiff cites to *Diamond v. Hospice of Florida Keys, Inc.*, for the proposition that that an employer's good faith belief does not preclude FMLA interference claims. 677 F. App'x 586, 592 (11th Cir. 2017). Specifically, Plaintiff contends *Diamond* stands for the proposition that "[t]he intent of the employer is not relevant to an FMLA interference claim." *Id.* Of course, as a general principle, that is true. However, to the extent Plaintiff argues that *Diamond* precludes consideration of an employer's honest suspicion in disciplining an employee for dishonestly using FMLA leave, that decision is distinguishable from this case. In *Diamond*, the Eleventh Circuit stated that "[t]he intent of the employer is not relevant" in the context of "unlawful employer interference" which "includes not only refusing to authorize FMLA leave, but also 'discouraging an employee from using such leave." *Id.* (citing *Martin v. Brevard Cty. Pub. Sch.*,543 F.3d 1261, 1267 (11th Cir. 2008).

1998 WL 307454, *2 (N.D. Fla. April 27, 1998) (finding no violation of the FMLA where undisputed evidence established that the employer terminated employee based on conclusion that employee was not using his leave time for its intended purpose and was not being candid with his managers about his leave, even if in fact no misuse occurred), *aff'd without published opinion,* 170 F.3d 188 (11th Cir.1999); *see Scruggs v. Carrier Corp.,* 688 F.3d 821, 825 (7th Cir. 2012) ("an employer can defeat an [FMLA] interference claim by showing, among other things, that the employee did not take leave for the intended purpose.") (internal quotations omitted); *Warwas v. City of Plainfield*, 489 F. App'x 585, 588 (3d Cir. 2012) ("[A]n employer may defeat an FMLA claim if the discharge was based upon the employer's honest belief that the plaintiff either misused or failed to use her medical leave for the intended purpose.").

First, as an initial matter, and to reiterate this point, Adams took his FMLA leave on Christmas day 2017. So, his interference theory is not that he was prohibited from taking his leave, only that he was disciplined for doing do. "'Thus, Plaintiff's FMLA claims [for retaliation and interference] essentially merge into one claim,' which 'sounds in retaliation, not interference.'" *Talley v. Triton Health Sys., LLC*, No. 2:14-CV-02325-RDP, 2016 WL 4615627, at *11 (N.D. Ala. Sept. 6, 2016) (citing *Hawkins v. BBVA Compass Bancshares, Inc.*, No. 2:12-CV-03922-RDP, 2014 WL 4715865, at *16 (N.D. Ala. Sept. 22, 2014), *aff'd*, 613 F. App'x 831 (11th Cir. 2015)) . And, "[b]ecuase 'h[is] interference claim is largely a clone of h[is] FMLA retaliation claim,' Plaintiff's interference claim based on h[is] termination fails as a matter of law, and the question *vel non* is whether Defendant retaliated against her." *Id*. (citing *Hawkins*, 2014 WL 4715865, at * 16) (emphasis in original).

Second, it follows inexorably that if an employer articulates a good faith (but mistaken) reason for believing that an employee has misused his FMLA benefits, a subsequent disciplinary

action cannot support an FLSA interference claim. "Otherwise, [a] plaintiff would enjoy a greater right to continued employment that if he been continuously employed during his FMLA leave." *Wu v. Se.-Atl. Beverage Corp.,* 321 F. Supp. 2d 1317, 1341 (N.D. Ga. 2004) (internal quotations omitted). As previously discussed, CSX articulated a good faith belief for Adams's suspension. And because CSX articulated this good faith belief, under these circumstances, the Rule 56 facts surrounding Adams's suspension do not support an FLSA interference claim.[18]

Third, and alternatively, Adams claims that his temporary reinstatement (*i.e.*, returning to his position as a conductor after marking off FMLA on December 25, 2017) was illusory because he was removed from service a mere seven days later. (Doc. # 45 at 31-32). Adams argues that his alleged "illusory" reinstatement is analogous to an employer allowing cursory reinstatement to comply with the law, and subsequently demoting an employee a short time later. But, this argument misses the mark by a wide margin. Adams was not demoted or terminated after returning to work from his December 25, 2017 FMLA mark-off. Rather, he was suspended pending a disciplinary hearing. To be clear, Adams was neither demoted nor terminated for using his FMLA leave.

Finally, Adams argues that CSX's FMLA policy limits the number of holidays an employee may use FMLA leave (*i.e.,* four out of the previous ten holidays). (Doc. # 45 at 29). He contends that this restriction necessarily deprives any employee who marks off on four or more holidays within a ten-holiday period of his FMLA benefits. (*Id.*). As persuasive as his Adams's policy argument may be, (again) Adams has failed to show that *he* was actually denied his FMLA

---

[18] To be clear, this is not a case where the Rule 56 evidence suggests that CSX "failed to investigate" or was "willfully ignorant." Although Johnson's initial review of the suspected dishonest Christmas FMLA usage by Adams occurred in a short window of time, CSX provided Adams with a hearing, allowed him to present evidence, and permitted him to question witnesses. And, the recommendation to suspend him was reviewed by both Jones and Layne before formal discipline was issued. Thus, Adams's willful ignorance and failure to investigate arguments lack any merit.

benefits. Indeed, there is no evidence in the Rule 56 record that indicates Adams was ever denied

FMLA leave. Therefore, Adams's FMLA interference claim is due to be dismissed.

### C.  Outrage

Under Alabama law, to recover for the tort of outrage "a plaintiff must demonstrate that

the defendant's conduct '(1) was intentional or reckless; (2) was extreme and outrageous; and (3)

caused emotional distress so severe that no reasonable person could be expected to endure it.'"

*Little v. Robinson*, 72 So. 3d 1168, 1172 (Ala. 2011) (citations omitted); *see Am. Rd. Serv. Co. v.

Inmon* 394 So. 2d 361 (Ala. 1980). The tort of outrage "does not recognize recovery for mere

insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Inmon*, 394 So. 2d

at 364-65 (internal citations and quotation marks omitted). Rather, the Alabama Supreme Court

has severely limited the instances in which it will find the tort exists. As the court has stated:

> [O]ne who by extreme and outrageous conduct intentionally or recklessly causes
> severe emotional distress to another is subject to liability for such emotional distress
> and for bodily harm resulting from the distress. The emotional distress thereunder
> must be so severe that no reasonable person could be expected to endure it. Any
> recovery must be reasonable and justified under the circumstances, liability ensuing
> only when the conduct is extreme. By extreme we refer to conduct so outrageous
> in character and so extreme in degree as to go beyond all possible bounds of
> decency, and to be regarded as atrocious and utterly intolerable in a civilized
> society.

*Id.*

In fact, the Alabama Supreme Court has historically found the tort of outrage arises

only in cases dealing with severe sexual harassment, reckless handling of dead bodies, and

extremely coercive tactics used by an insurer to force an insured to surrender a claim. *See Busby

v. Truswal Sys. Corp.,* 551 So.2d 322 (Ala. 1989) (finding sufficient evidence to support a claim

of outrage against a defendant when plaintiffs provided seventeen examples of his lewd sexual

harassment, including evidence that the defendant said that he wished that the plaintiffs would

come to work braless and wear less clothing, openly stared at the plaintiffs' sexual anatomy, and

stated that he should send one of the plaintiffs across the street to where a group of men were standing because she stayed sexually aroused all of the time); *Whitt v. Hulsey,* 519 So.2d 901 (Ala. 1987) (finding evidence sufficient to support a claim of outrageous conduct when Defendant acted recklessly in clearing the land around the cemetery where relatives of the plaintiffs were buried); *National Sec. Fire & Cas. Co. v. Bowen,* 447 So.2d 133 (Ala. 1983) (finding outrageous conduct when insurance agents (1) bribed witnesses to testify falsely against plaintiff; (2) attempted to coerce the plaintiff to drop said insurance claim and plead guilty to criminal charges by telling plaintiff they could obtain probation for the plaintiff; (3) harassed the plaintiff by continually telephoning, at all times of the day, the plaintiff and other members of her family; and (4) threatening the plaintiff and members of his family in an effort to coerce plaintiff to drop the insurance claim).

Here, Adams's outrage claim necessarily fails. Adams alleges that "CSX engaged in a widespread protracted pattern of outrageous conduct designed to contravene public policy in order to intimidate employees into not exercising their legitimate and approved FMLA rights on holidays." (Doc. # 1 at ¶ 57). Even viewing the facts in the light most favorable to Adams, these allegations are not distinguishable from the thousands of garden variety discrimination claims filed each year.

Adams claims that this is not a "run-of-the-mill employment dispute." (Doc. # 45 at 48). Adams cites to *Lees v. Sea Breeze Health Care Center., Inc*., for the proposition that outrage claims may exist in the employment context if the violation of public policy furnishes the requisite "sound of fury."[19] 391 F. Supp. 2d 1103, 1108 (S.D. Ala. 2005). In *Lees*, the district court found that "a

---

[19] The court notes that *Lees* was issued in 2005 and was based on a Rule 12(b)(6) Motion to Dismiss. *See* FED. R. CIV. P. 12(b)(6). In allowing plaintiff's outrage claim to proceed, Judge Steele ruled that "[a]t this nascent stage of the proceedings, the [c]ourt cannot rule out the possibility that Lees may be able to prove such a set of facts." *Lees*, 391 F. Supp. 2d at 1108. However, since the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544

ten-month onslaught of harassment, a slew of adverse repercussions, and a firing, all because the plaintiff had enlisted in the U.S. Air Force Reserves, would offend public policy." *Id*. Whatever can be said about whether the Alabama Supreme Court would recognize the tort of outrage if presented with the facts in *Lees*, this court can say with confidence that *Lees* is distinguishable from this case. Here, Adams was previously warned (twice!) about his suspect FMLA usage, suspended from work pending a disciplinary investigation, given the opportunity to appear at a hearing, and was ultimately suspended. Clearly, these facts do not furnish the requisite "sound of fury."

The bottom line here is that the Rule 56 facts in this case simply do not support a finding that CSX "caused emotional distress so severe that no reasonable person could be expected to endure it." *Little*, 72 So. 3d at 1172. As a result, his claim for outrage is due to be dismissed.

### D. Remaining State Law Claims[20]

Adams further alleges that CSX is liable for negligent and/or wanton training and supervision. (Doc. # 1 at ¶¶ 49-58). Specifically, Adams asserts that CST negligently trained and supervised the managers involved in disciplining him. (*Id.*). But, to maintain a claim for negligent and/or wanton training or supervision against CSX, Adams must allege a tort claim that is cognizable under Alabama Law. *Shuler v. Ingram & Assocs.,* 441 F. App'x 712, 721 (11th Cir.

---

(2007), and  *Ashcroft v. Iqbal*, 566 U.S. 662 (2009), a plaintiff must plausibly allege facts on the face of the well-pleaded complaint sufficient to state a claim. Thus, the court is unsure of how *Lees* would be decided today. In any event, this issue is presented in a Motion for Summary Judgment and the Rule 56 record is clear.

[20] CSX argued in its motion for summary judgment (Doc. # 43) that Adams's claims for negligent and/or wanton training, as well as negligent and/or wanton supervision should be dismissed. Adams failed to respond to CSX's argument in its responsive briefing. (Doc. #45). In its reply brief, CSX maintains that summary judgment should be granted on the claims ignored by Adams. (Doc. # 50 at 10-11); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.") (citing *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995). The court agrees. However, in an abundance of caution, the court analyzes Adam's remaining state law claims on their merits.

2011) (finding that Plaintiff's "wanton and reckless supervision and training claim fails as a matter of law because they have failed to establish that [defendant's] employees committed any tort under Alabama law."). As previously discussed, Adams's outrage claim is due to be dismissed.

Further, Adams's remaining federal causes of action will not support his allegations of negligent and/or wanton training or supervision. *Williams v. United Launch All., LLC*, 286 F. Supp. 3d 1293, 1311 (N.D. Ala. 2018) (holding that "[t]o establish a negligent supervision and training claim, Alabama law requires that the alleged, derelict employee engage in tortious conduct. The underlying wrongful conduct must constitute a common-law, Alabama tort, not a federal cause of action such as Title VII.") (internal citations and quotations omitted). Therefore, Adam's allegations of negligent and/or wanton training or supervision are due to be dismissed, because the claim has been abandoned and also because it fails on the merits.

## IV.     Conclusion

After careful consideration, and for all of the reasons stated above, Defendant's Motion for Summary Judgment (Docs. # 36, 38, 43) is due to be granted, and Plaintiff's Complaint (Doc. # 1) is due to be dismissed with prejudice. An order consistent with this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this March 18, 2020.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE